**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

REGINALD T. HANNAH,

                              Plaintiff,

    v.                              No. 08-CV-441
                                    (GLS/DRH)

P. VanGUILDER, Deputy Superintendent of
Security; RICHARD ARMSTRONG, Watch
Commander Lieutenant; MICHAEL
CUMMINGS, Escort Guard; and DAVID
STEMP, Recreation Supervisor,

                              Defendants,

---

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| REGINALD T. HANNAH<br>Plaintiff Pro Se<br>04-R-2290<br>Southport Correctional Facility<br>Post Office Box 2000<br>Pine City, New York 14871 | |
| HON. ANDREW M. CUOMO<br>Attorney General for the<br>   State of New York<br>Attorney for Defendants<br>The Capitol<br>Albany, New York 12224-0341 | ADELE M. TAYLOR-SCOTT, ESQ.<br>Assistant Attorney General |

**DAVID R. HOMER
U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff pro se Reginald Hannah ("Hannah"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42

---

[1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

U.S.C. § 1983 alleging that defendants, four DOCS employees, violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 34. Hannah opposes the motion. Dkt. No. 38. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts herein are related in the light most favorable to Hannah as the non-moving party. See subsection II(A) infra.

On September 3, 2006, Hannah was taken from his cell for an afternoon meal and recreation. Compl. ¶ 29. Defendant Stemp initially escorted Hannah to the mess hall and "maintain[ed] supervision and control over . . . [the inmates] while they were in the mess hall" until he was relieved and his post was taken over by Defendant Cummings. Stemp Decl. (Dkt. No. 34-6) ¶¶ 5-7[2]; Cummings Decl. (Dkt. No. 34-5) ¶ 5. Upon arriving at the mess hall, none of the inmates were required to pass through the metal detector located in the hallway before the entrance to the cafeteria. Hannah Dep. (Dkt. No. 34-2) at 25. Additionally, there were no officers posted at the metal detector to conduct searches of the inmates. Id. at 27.

Metal detectors are governed by DOCS Directive 4910 which "permits, but does not require facilities to use . . . metal detectors or pat frisks as a pre-condition to allowing inmates to attend recreation in areas adjacent to the interior of the facility." VanGuilder

---

[2] Stemp was not in the mess hall on the date in question. Stemp Decl. ¶¶ 7. 8. Additionally, Stemp's shift concluded prior to the incident. Id. ¶¶ 12-13.

2

Decl. (Dkt. No. 34-3) ¶¶ 6-7; see also Dkt. No. 34-3, Ex. A(III)(2)(b) ("An inmate may be subjected to a metal detector search . . . going to and from . . . housing, and program areas . . . and as directed by staff."); Armstrong Decl. (Dkt. No. 34-4) ¶ 10.  It is important to note that "[m]etal detectors and pat frisks do not detect weapons secreted in the mouth or body cavities, and officers are not authorized to conduct body cavity searches in the absence of probable cause."  Armstrong Decl. ¶ 14.  The metal detector was not in use on this Sunday because the jail was understaffed.  Hannah Dep. at 44; see also VanGuilder Decl. ¶ 14 ("On weekends, due to limited staffing, unless staff has information that additional security protections are necessary, the [metal detectors] are not run.  Staff [instead] relies upon the implementation of random pat frisks . . . .").  Armstrong "was not authorized to direct staff to implement extraordinary security procedures [i.e. the metal detectors] without the direction of superiors, and the relatively low incidence of . . . assaults was not cause for [him] to alert [his] superiors that there was a need to do so."  Armstrong Decl. ¶ 20.  Similarly, Cummings "had no authority or control over the determination of when the metal detector in the mess hall foyer was run . . . and [neither he nor Stemp were] . . . assigned to run the metal detector on [September 3rd] . . . ."  Cummings Decl. ¶ 7; Stemp Decl. ¶ 9.

After Hannah finished his meal,[3] he entered the recreation yard and followed two of his friends to the basketball court in an area known as "the hole".  Hannah Dep. at 28-29.[4]  This

---

[3] Inmates "do not have access to metal items [inside the cafeteria].  All plates, cups, trays and eating utensils are made of plastic."  VanGuilder Decl. ¶ 9.  "An officer is assigned to oversee the . . . inmates while they are in the mess hall, and a sergeant is assigned to ensure that all inmates turned in their plastic utensils before entering the yard."  Armstrong Decl. (Dkt. No. 34-4) ¶ 12.

[4] Cummings did not immediately enter the recreation yard as he was "responsible for escorting the inmates who did not choose to [go] out to the recreation yard back to

area was difficult to observe from other areas of the yard, but "[i]nside the yard, inmates are under surveillance of five armed posts, three located in towers on the perimeter walls, and two on towers located inside the perimeter walls . . . and at least one tower has a clear view of 'the hole' . . . ." VanGuilder Decl. ¶ 11; see also Cummings Decl. ¶ 8 (stating that the hole "is observable from the tower and by officers or sergeants patrolling the yard."). Officers are also stationed in the yard in both fixed and patrol positions. VanGuilder Decl. ¶ 12.

While walking to the hole, Hannah observed Stemp inside the equipment room speaking with another officer. Hannah Dep. at 48. When Cummings returned from escorting inmates back to their cells, he reported to his station in the weight yard, an area separate from the hole. Cummings Decl. ¶ 9. Upon arrival at the hole, Hannah's friends began playing basketball while he watched. Hannah Dep. at 31. Hannah noticed a group of six individuals approach the court and begin whispering before one individual approached Hannah. Id. at 29-31. Hannah did not know the individual who approached him, later identified as inmate Andre A., and felt no fear or threat. Id. at 30-31. The two engaged in a short conversation and, when Hannah looked away, Andre "pulled [out] a metal object and slashed [Hannah]."[5] Id. at 31.

Andre then dropped the object on the ground, and another inmate, later identified as inmate Sean A., approached Hannah and began fighting with him. Hannah Dep. at 31-32,

---

lock-up." Cummings Decl. ¶ 5.

[5] It is unclear where the weapon originated, but it is undisputed that a thorough sweep of the recreation area was performed by corrections staff before inmates were allowed out for recreation. Hannah Dep. at 50-51; Armstrong Decl. ¶ 13. Thus, it is reasonably inferable that the weapon was concealed on Andre's person.

38-39. As Andre fled, Hannah heard someone yell "Blood up," a common slang term used by the Bloods gang. Id. at 32; Dkt. No. 34-4 at 19, 22. Hannah speculates that the attack may have been random and related to a gang initiation as Hannah "did [not] know [Andre] . . . at all [and had] never met him before . . . ." Hannah Dep. at 32; see also Hannah Dep. at 24, 35 (explaining that Hannah had ever met Andre prior to the attack and had not received any threats or felt uncomfortable during his tenure at the correctional facility); VanGuilder Decl. ¶¶ 15-16 (stating that "[s]taff . . . rely upon . . . notice . . . by inmates or staff of threats . . . and the inmate's known enemy reports," and that Hannah had neither reported any threats or indications of trouble nor any known enemies); Armstrong Decl. ¶¶ 15-16 (same); Cummings Decl. ¶ 11 (same);Stemp Decl. ¶ 11 (same); Dkt. No. 34-4 at 17, 19, 22 (reporting that according to Hannah, he was surprised by the attack as Andre "came out of nowhere and started fighting with [him].").

    The altercation was seen by a corrections officer from a watch tower. Dkt. No. 34-4 at 7, 19, 22. Two officers responded to the altercation. Hannah Dep. at 39; Dkt. No. 34-4 at 7. The area was searched by corrections officers and no weapon was found. Dkt. No. 34-4 at 7. However, officers did find a t-shirt with blood on it and the message "RIP B" written on it in highlighter. Id. at 19, 22, 20, 23. Hannah was then taken to the infirmary for treatment. Hannah Dep. at 39; Dkt. No. 34-4 at 11. Due to the gravity of the laceration, Hannah was sent to Glens Falls Hospital where he received thirty-two stitches. Hannah Dep. at 39-40; Dkt. 34-4 at 7, 11.[6]  In the month prior to the altercation, "there were seven total inmate-on-inmate assaults for the entire prison . . . [and] only two [of those] took place in the yard . . .

---

[6] Hannah contends that he still experiences pain in and around his ear where the stitches were placed. Hannah Dep. at 33

during evening recreation periods . . . [when inmates] are required to pass through the metal detectors." Armstrong Decl. ¶¶ 18-19.

On September 5, 2006, Hannah was questioned in connection with an investigation of the event. Dkt. No. 34-4 at 24, 25. Hannah could not identify his assailant at that time, though Hannah did express an interest in pursuing outside criminal charges for the attack. Id. After Hannah was returned to general population, he was instructed to contact the investigator in the event Hannah recognized his attackers. Hannah Dep at . 40-41; Dkt. No. 34-4 at 24, 25. A few days later, Hannah saw Andre, contacted the investigator, viewed a photographic display, and positively identified Andre as his assailant. Hannah Dep. at 40-41; Dkt. No. 34-4 at 26. Hannah pressed criminal charges against Andre and testified at Andre's prison disciplinary hearing. Hannah Dep. at 41; Dkt. No. 34-4 at 26. After the disciplinary hearing, Hannah was placed into protective custody. Hannah Dep. at 41-43; Dkt. No. 34-4 at 31-32. This action followed.

### III. Discussion

In his complaint, Hannah alleges that his Eighth Amendment rights were violated when defendants failed to protect him from the random attack by not requiring inmates to go through the metal detectors and be pat frisked prior to entering the cafeteria and recreation yard. Defendants move for summary judgement on all claims asserting that Hannah cannot recover against defendants (1) in their official capacities, (2) because they were not personally involved, (3) because his constitutional claims lack merit, and (4) because they are entitled to qualified immunity.

6

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

7

**B. Eleventh Amendment**

Hannah sues the state defendants in both their individual and official capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, Hannah seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCS. Thus, the Eleventh Amendment bar applies and serves to prohibit Hannah's claim for monetary damages against the

8

individual defendants in their official capacities.

Accordingly, it is recommended that defendants' motion be granted on this ground and that judgment be granted to all defendants as to Hannah's claims against them in their official capacities.

### C. Personal Involvement

Defendants contend that Hannah has failed to establish that any of the individual defendants were personally involved in any of the alleged constitutional deprivations.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

9

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

### 1. VanGuilder

VanGuilder, former Deputy Superintendent of Security, was undisputedly not on duty the day of the altercation and thus not directly involved. VanGuilder Decl. ¶ 4. Additionally, the record is clear in showing that there was no prior complaint or warning that such a violent act would occur, so VanGuilder had no notice of any violations and thus did not fail to correct or remedy and situation. Furthermore, a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. Wright, 21 F.3d at 501. Thus, VanGuilder cannot be held liable solely because he held a supervisory position.

However, liberally construing Hannah's complaint, he argues that the metal detector policy should be amended so that it is always in use to prevent weapons from unnecessarily being smuggled into the recreation area. VanGuilder, as Deputy Superintendent of Security, apparently had decision making power over implementation of such security policies. The then existing policy of using the detectors only sporadically and not on weekends when the facility was understaffed arguably permitted weapons to be introduced into the recreation area creating an unreasonable risk to the safety of inmates such as Hannah. Assuming the viability of this theory,[7] a question of fact arises as to whether VanGuilder created a policy or custom regarding metal detector usage on the weekends

---

[7]But see subsection C infra.

whereupon inmates' health and safety was at risk.

Accordingly, defendants' motion is denied on this ground as to VanGuilder.

### B. Armstrong, Cummings, and Stemp

Armstrong, a watch commander, was responsible for conducting role call, prior to returning to the Watch Commander station which was located nowhere near either the cafeteria or recreation yard. Armstrong Decl. ¶¶ 3-4, 6. Thus, he was not directly involved in the incidents of September 3. Despite Armstrong's position as a supervisor, this fact alone is insufficient to impose personal liability. Wright, 21 F.3d at 501. Additionally, Armstrong had no decision making authority over when or who was to utilize the metal detector. Armstrong Decl.¶ 20. Moreover, there is nothing in the record to suggest that Armstrong was deliberately indifferent in supervising individuals or had any advance knowledge that such an incident was going to occur.

Similarly, neither Cummings nor Stemp were directly involved in the altercation that occurred in the recreation yard. Stemp escorted Hannah to the cafeteria, and supervised the inmates within, until he was relieved by Cummings,[8] who then took the inmates back to their cells that did not wish to go out for recreation time and reported to patrol a different area of the recreation yard. Cummings Decl. ¶¶ 5, 9; Stemp Decl. ¶¶ 5-7. Thus, neither was near the altercation when it occurred. Additionally, neither defendant was assigned to the metal detectors or had the authority to order them implemented. Cummings Decl. ¶ 7;

---

[8] Although Hannah claims to have seen Stemp in the yard, Stemp was off-duty at the time of the altercation. Stemp Decl. ¶¶ 12-13. Even if Stemp was in the yard at the time of the altercation, Hannah does not contend that Stemp was near the basketball court when the assault occurred.

Stemp Decl. ¶ 9.  Furthermore, there is nothing in the record to suggest that either defendant was a supervisor or had authority over other individuals, or had any advance knowledge that such an incident was going to occur.  Accordingly, defendants' motion should be granted on this ground as to Armstrong, Cummings, and Stemp.

### C. Eighth Amendment

Eighth Amendment obligations also include the duty to protect prisoners from other known harms.  Farmer, 511 U.S. 825, 829 (1970).  "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Id. at 832.  Where the inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Id. at 834 (citing Helling v. McKinney, 509 U.S. 25, 31-32 (1993)).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).  In order to state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated under conditions imposing a substantial risk of serious harm," and (2) the prison official must "know of and disregard an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Matthews v. Armitage, 36 F. Supp. 2d 121, 124-25 (N.D.N.Y. 1999) (citing Farmer, 511 U.S. at 834) (internal citations and quotation marks omitted).

12

In this case, Hannah offers no evidence to satisfy the subjective prong of the test. First, all parties agree that Hannah had no advance knowledge of the attack, did not know the inmates who assaulted him, and had no fear of being assaulted. Hannah Dep. at 24, 30-32, 35; VanGuilder Decl. ¶¶ 15-16; Armstrong Decl. ¶¶ 15-16; Cummings Decl. ¶ 11; Stemp Decl. ¶ 11. Thus, neither Hannah nor the defendants were aware that Hannah was in risk of serious danger or harm. There were also no indications from which a reasonable officer could have drawn an inference that Hannah may have been in danger.

Additionally, Hannah's claims that, because a violent attack occurred in the recreation area defendants should always have been using the metal detectors, is unavailing. See Warren v. Goord, 476 F. Supp. 2d 407, 411 (S.D.N.Y. 2007) (discussing case in which inmate alleged failure to protect due to failure to install metal detectors whereupon summary judgment would have been avoided had the inmate "made specific allegations as to the level and type of previous violence in the yard and whether it was serious and similar enough to put defendants on notice of the substantial risk of danger.") (citations omitted). Here, Hannah fails to proffer evidence, other than conclusory and general allegations, that other similar slashings occurred in the hole.[9] Such statements are insufficient to survive a motion for summary judgment. Id.

Despite Hannah's lack of information, defendants, stated that in the month prior to Hannah's attack, only two fights had taken place in the recreation yard and that, prior to both altercations, all the inmates had been forced to pass through the metal detectors.

---

[9] Hannah states that in the hole, "a lot of the cuttings and stabbing go on down there . . . ." (Hannah Dep. at 28) and that he has "never seen, but . . . heard," that a lot of fights go on in the recreation yard. Hannah Dep. at 37.

Armstrong Decl. ¶¶ 18-19.  Defendants state that this information failed to subjectively indicate that there was a serious or pervasive problem with slashings during recreation time so that metal detectors were required all of the time.  Defendants were entitled to use the detectors on a discretionary basis, pursuant to the regulations, and relied on the training for random pat frisks, and extensive searches of the recreation yard to alleviate such weapons threats.  These searches were acknowledged by Hannah to have occurred and been thorough.  Hannah Dep. at 50-51.

Additionally, inmates were only allowed plastic utensils in the cafeteria prior to entering the recreation yard, were monitored while eating and turning in their utensils prior to entering the recreation yard, and were watched by corrections officers in five towers plus those additional officers stationed and on patrol on foot while in the recreation yard. VanGuilder Decl. ¶¶ 9, 11-12; Cummings Decl. ¶¶ 5, 8.  While only using the metal detectors during the week was arguably wrong or even negligent, this still does not rise to the level of deliberate indifference actionable under the Eighth Amendment.  See Farmer, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment."); Warren v. Goord, 579 F. Supp. 2d 488, 496 (S.D.N.Y. 2008) (holding that "even if a prison official is aware of a risk, he may be found free of liability if he responded reasonably to the risk, even if the harm ultimately was not averted.") (internal quotation marks and citations omitted).  At best, Hannah asserts that defendants were negligent in failing always to use the metal detectors.  Such contentions are insufficient to sustain an Eighth Amendment claim.  See Matthews, 36 F. Supp. 2d at 126 ("Additional precautions might have prevented the stabbing here, but the failure to institute such

14

precautions at most constituted negligence.").

Accordingly, defendants' motion should be granted on this ground.

### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights." Smith v. City of Albany, No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. As discussed supra, there have been no questions of fact raised as to Hannah's claims and, therefore, the second prong need not be addressed.

Moreover, even if it could be said that Hannah has shown an Eighth Amendment

15

violation, such a violation is defeated by qualified immunity. As previously discussed, defendants acted reasonably in not running the metal detector given that there was no previously identified risk of harm to Hannah by either of these inmates and that defendants already employed many safety procedures with searching the recreation yard and observing the inmates both during meal and recreation times.

In the alternative, defendants' motion should be granted on this ground.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 34) be **GRANTED** and that judgment be entered for all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 11, 2010
       Albany, New York

                                            *David R. Homer*
                                          United States Magistrate Judge